May it please the Court. My name is Misty Hadaway-Kane. I represent Appellant Jesus Alonzo. In my time before the Court, I'm going to walk the Court through a few of the key facts due to the fact-intensive nature of this Court's review of a JMLL, and then I'm going to hit on the high points of why there is factually and legally sufficient evidence in the record to support each of the tenets of the Memorandum of Opinion and Judgment, which we believe wrongfully entered below by the trial court. I'm sure your Honor is well aware of the facts. This is a slip and fall. Jesus Alonzo visited the Church's chicken with a companion on June 27, 2019. He went to the restroom, and while going to the restroom, the restroom is in this hallway, and it's the only entrance and exit from the kitchen. As he was walking to the restroom, he slipped and fell. He touched the ground and noticed a wet, greasy substance. He went back to his desk or to his table, advised his companion. His companion went to try to make a report with the manager. The manager said, we don't make reports over incidents, and he left and went to the doctor with his companion. He then returned to file a report, and a police officer accompanied him. At that time, the Church's manager took the report, and a police report was made as well. Fast forward to suit being filed. It was subsequently removed. Litigation commenced. Let's talk about what the real procedural issues are. During the course of litigation, defendant moved for summary judgment. That summary judgment was denied. The case was then called to trial. Very first day of trial, defendant moved to court sponsored motion. That too was denied. Closed the plaintiff's case. Directed verdict was denied. Right before charging instructions, JMOL was requested. That too was denied. It was the fourth bite at the proverbial apple of defendant's JMOL. 30 days after the original judgment, because the verdict had been entered for a little over $183,000 for Mr. Alonzo's personal injuries, defendant moved for a fourth time for dispositive verdict in its favor. 180 days later, the trial court reversed ranks. I believe I used the word flip-flopping in the brief, because after three times of looking at the legal and factual sufficiency of the evidence, for this fourth time, the trial court then determined that it was legally insufficient. The court didn't flip-flop. The court considered all the evidence at each stage and then made a decision based on the evidence, right? We believe that. I don't mean to be disrespectful by the use of flip-flop, Judge Hanks. What I will say is, at each stage, you are correct. The judge looked at the evidence at that time and assessed whether or not there was factually sufficient evidence to support the verdict. Or to support, at that stage, the nature of the claims. The verdict... My observation, at least, is that most trial judges are going to deny every motion for judgment as a matter of law. Let the jury decide, and maybe the jury will take the burden off the judge, and he or she won't have to rule. But that's sort of the prudent course for most trial judges. Absolutely, Your Honor. I mean, I've been doing this 22 years, and it's the first time I've seen a JMOL be successful. And I spent a good bit of time on the defense side of the bar. You are correct. That is kind of the part and parcel and practice of dispositive motions. In certain instances, you have to fall into reserve the factual sufficiency issue for appellate review. But in this instance, when you look at the evidence that was in the record, and I can walk the court through it. When you look at the evidence that was in the record for church's knowledge, whether actual or constructive, when you look at the evidence that was in the record for the causation, and when you look at the record that was in the evidence when you go to the elements of the constructive knowledge with regard to the proximity, the conspicuity, and the temporal timeliness basis, you'll see that there is more than a scintilla of evidence. There is enough evidence to support the jury's verdict, and that is the real issue, Your Honor. And when you look at the lengthy memorandum opinion supporting the trial court's take-nothing judgment that was entered, you see that what respectfully the trial court did was it engaged in its own bit of weighing the evidence and credibility of the witnesses and putting itself in the shoes of the 12 members of that jury. Can we talk about just one issue really quickly? Let's talk about the issue of you mentioned temporal longevity, so to speak. What's the evidence that this substance was on the ground or on the floor long enough for the defendant to have constructive notice of the issue? Because there's really no evidence of actual knowledge, is there? There's no direct evidence. We believe that there is circumstantial evidence, and we highlighted that in our briefing. But to directly answer your question, Judge Hanks, when you look at the case law on that temporal issue, the long enough standard really varies from case to case, and it is fact-specific. There are some cases that were cited in the briefing that 8 minutes was enough. There's cases that were cited in the briefing that 30 minutes wasn't enough. It really depends on the factual nature of where the condition was located. And here, Your Honor, there is evidence in the record about Church's mopping policy and inspection policy. And so we know from the evidence in the record that Church's has a policy that every 30 minutes it's going to inspect the floors. We know from the evidence in the record that it is going to, if there is a condition of a greasy nature on the floors, that they are going to require that the floor be mopped, and that if the floor is mopped or if there is even a condition that requires mopping, that they're going to put out a sign that says, you know, be careful, wet floor, you know, to raise awareness and provide notice to the invitees as they come on the premises. And what we know, Your Honor, again, this is cited in the brief, that we have, when Mr. Alonzo fell, he felt greased and water, like it had just been mopped. And the trial court noted this as evidence in his memorandum opinion and said that it was speculative for Alonzo to have assumed that it had been from mopping. Well, we also have, Your Honor, evidence that we have Church's employees that are going throughout the premises every 30 minutes. We have a Church employee that saw Mr. Alonzo immediately after he fell and just stepped over him, didn't offer to help. I say that not to cast judgment on Church's not offering to help, but on an awareness that there was a wet spot that obviously caused him to have fallen. Wait a second. I don't understand. Because they stepped over him, they knew there was a wet spot? Well, Your Honor, I think that there's an inference that can be made because he slipped. The individual saw that he had slipped. He got up and raised his hand. The record says, I felt it was wet and greasy. The Church's employees saw that happen and stepped over him, that there was some awareness that there was wet on the floor. In addition, there is evidence in the record of testimony from the only witness that the defendant called that they know that there is grease on the employee's feet as they walk in and out of the kitchen, which is why they have that mopping policy, right? Because there is the ingress and egress of carrying it on your feet. And so our argument, Your Honor, is that because we have the evidence of grease being tracked in and out, Gomez even testified that she has to take her shoes off when she gets home because she has so much grease on her feet because we have the evidence of the mopping policy where every 30 minutes there has to be someone that comes out and sees it. Because we have the evidence from Mr. Alonzo where he touched it when he fell to the floor and it was wet and greasy. It wasn't just grease. It was wet and greasy so that an inference can be made that it had been mopped, but perhaps insufficiently, that there is some indicia, some, a scintilla of evidence of a condition. In addition, Your Honor, when we look at the evidence of longevity, we see that this case is very similar to the Walmart decision that addressed the circumstantial evidence and the proper use of circumstantial evidence for this temporal basis argument, Your Honor. When we look at the, I'd like to turn the Court's attention to the Jefferson v. Aikens case because while it did not address the timely temporal issue, it did address the use of circumstantial evidence and constructive knowledge. And so while we did brief that in our briefing, the few high points that I'd like to draw the Court's attention to has to do with the lack of direct evidence but the existence of circumstantial evidence being enough. And so, Your Honor, in that case, it was circumstantial evidence that the floors were wet, an employee who supervised a work group mopping the hallway but not necessarily the specific area. There was a warning to people of the possible wet floors. There was a sign because they were being mopped regularly. And in that instance, the defendant utilized the argument that there had been no evidence of any accidents in the two years preceding this and to try to argue that that coupled with the lack of direct evidence that it wasn't enough to support the jury's verdict. But, Your Honor, that's not what the Court of Appeals found. The Court of Appeals found that the fact that there was, or rather the lack of a report in and of itself was not enough. And when you look here, you've got the fact that Mr. Alonzo tried to make a report. You've got the fact that the manager said there's no need for a report. We don't do that for a slip and fall. He had to come back with a police officer, and then he made a report. And then also, Ms. Gomez, the manager, who was, again, the only witness who testified for the defendant, she actually had slipped and fallen herself during her employee with Church's Chicken because of the grease on the floor. In the kitchen. It was in the kitchen. But, again, Your Honor, that hallway is the only ingress and egress to and out of the restaurant. And so, in addition, there is evidence in the record about how these employees inherently carry grease to and fro through the restaurant as they enter and exit from their breaks or even entering and exit as they leave the day from that kitchen. And so, Your Honor, that, again, is why that mopping policy and protocol was adopted to inspect the floors to make certain that they're safe for the invitees that come in on the premises. And that is why they have the policy of inspecting the floors if there is a condition to mop it. And so, Your Honor, when we look at the circumstantial evidence and we look at the reasonable inferences from that circumstantial evidence, there is factually sufficient evidence to support the jury's verdict. And that's really what we're at issue here. It sounds like you're saying Church's just needs to have a person posted there with a mop. Not at all, Your Honor. Not at all. And I apologize if that's the inference. Well, because you're saying it's inevitable that grease is going to be tracked and grease is going to be there all the time, so there needs to be somebody there mopping in warning of grease is being removed, it's wet, be careful. No, Your Honor, because what the law requires is reasonable steps. That's what the law requires. And I would concede that that is probably not reasonable to follow every single rule. We're in the continuum between mopping, standing right there mopping, and the 30-minute inspection is reasonable. When does the constructive notice kick in? Well, the constructive notice kicks in, Your Honor, when they are mopping and they aren't mopping sufficiently, when they are aware of the condition that they have created by virtue of this ingress and egress of grease on their shoes and they aren't doing enough. And, Your Honor, Alonzo testified that he touched the floor as he fell and it was greasy and wet, so it was the mixture of the grease and the water. Perhaps what they're doing, the reasonable care that they're attempting to provide, is insufficient, Your Honor, because they themselves are the ones that are creating this condition. I'm not asking for the court to adopt a policy that every single church's employee is followed by someone with a mop. That's a far cry from what I'm saying. What I'm saying, Your Honor, is when an entity is aware of a dangerous condition that it creates. No, I'm just saying, you're saying here they know that people track grease out of the kitchen where customers are going to be. So that's constructive notice. Well, Your Honor, that alone is not constructive notice. What extra fact makes it constructive notice? Well, the extra, I'll use your word choice, the extra facts that rise to the level of the constructive notice, the fact that the manager testified that she herself has slipped on the grease, the fact that inherently when you mop something the floor is wet or slippery. If, in fact, that Mr. Alonzo slipped on a wet floor, which is what he believes happened, he testified that it was greasy and wet, there was no sign that said, be careful, wet floor, which would be inconsistent with church's own policy. And so, Your Honor, if you are Someone didn't spill a drink there. I'm sorry, Your Honor? Someone didn't spill their drink there. Well, there was no indication or any evidence that there was a spill of a drink there. Well, if it was wet, how do we know how it got wet? Well, we don't know how it got wet, Your Honor, but we have the reasonable inference from what the facts are. And what the facts are is it was a greasy, wet floor that Mr. Alonzo slipped on. And so the reasonable inference from that, Your Honor, is that if it was mopped, there was no warning provided to the invitees that it was a wet floor. That's one reasonable inference. Another is that somebody spilled their drink or ice or whatever. What makes one more probable than the other? Well, Your Honor, there would have to have been evidence in the record to support a reasonable inference that it was a wet floor because someone spilled a drink. There was nothing in the record. Defendant actually submitted three ideas in its briefing about other alternative sources for the water substance. I'm going to call it a water substance because there was grease that was in the hallway of which Mr. Alonzo slipped. But the fact is, again, as we briefed, none of those three alternative sources had any evidence to support it. And what the jury is allowed to do is make a reasonable inference from the evidence that was submitted to it. And the only reasonable inference from the evidence that was submitted to it is that it was a wet floor. It depends on who's got the burden here, doesn't it? Because you're saying, well, the defendants didn't offer any evidence that it was caused by someone spilling a drink, but it seems to me that's not their burden. Well, it's not their burden, Your Honor, and, again, I'm not saying that. But your question directly to me was, what about another source? Why couldn't it have been a spilled Coca-Cola versus greasy shoe? And so, Your Honor, what my job as the trial attorney's job is to present evidence to the record and to argue those reasonable inferences. And if there is circumstantial evidence in the record to support the jury's verdict, that, under a JMOL standard, is sufficient to deny that JMOL. And, Your Honor, the reasonable inference from the evidence in the record is that there was a greasy floor that was wet, perhaps from an attempt to mop, and that the defendant failed to put the warning sign out to warn and to advise those that are going in the hallway to be careful. And, Your Honor, that's the reasonable inference supported by the record. And run me through again. I'm sorry. I didn't mean to interrupt. But run me through again the reasonable inference as to how long that condition existed on the floor. Well, Your Honor, the reasonable inference is that it had been existing at least 30 minutes because of the fact of this 30-minute inspection policy. And so, if it had been in existence, if defendant had been following its policy of every 30 minutes, going about and looking and inspecting the premises to make it safe for ingress and egress in the hallway and for its patrons, then that dangerous condition would have been noticed within that 30 minutes. But if it, let's say somebody dropped a drink five minutes before that incident occurred, what's the evidence? Again, it's not just the evidence of the grease in the water. The issue is who put the grease in the water there and how long it's been there, right? I mean, we don't know what, we don't know where the water came from, and we don't know when the water was put there. What's the evidence as to where the water came from and when it was put there? So, Your Honor, I see that I'm out of time. May I directly answer your question? Oh, sure. Okay. So, who put it there isn't as important as how long it's been there under this aspect of the analysis. Because a defendant doesn't have to necessarily create the dangerous condition in order for it to be potentially liable under a premises liability theory. So, that is why the who isn't as important as the how long. As to the proximity, the proximity is... I guess when I say who, let me just step back for a second. I mean what, what the water was. Was it a mop? Water from mopping? Was it water from a drink? What's the evidence as to what that water was? I'm going to answer that question and then the other question. Okay. If that's okay, Judge Hanks. Okay, so again, what the substance is, is actually not as important as the fact that the substance is in a dangerous condition. What we know from the only person that touched the substance is that it was a greasy water substance. And that is what he slipped on. Time. The second one. Yes. The second one. First question, but the second one in my answer. So, the timeliness, temporal basis. When we look at the cases on the temporal basis line of examination, we find that the timeliness is what matters. The evidence in the record that I would direct the court to is that every 30 minutes, according to defendant's policy, they go and they inspect the floors. What we know is that this condition was on the floor in the minutes that Mr. Alonzo was walking to the bathroom when he slipped and fell. And so, we know that it had been there for some period of time because it had not been caught. Based upon the nature of the substance, the fact that it was a watery, greasy substance. It is speculation, but it is the belief that it had been mocked without any kind of a warning sign. Again, that is not what the substance was, isn't what matters. It's how long it had been there. I think we've got your argument. Okay. Thank you, Your Honor. Thank you. May it please the court. Good morning. Joseph Vail here for Church's Chicken. The court should affirm the district court's judgment in favor of Church's Chicken in this case. In doing so, it should hold that legally insufficient evidence supports the jury finding on the knowledge element under Texas law for a premises liability cause of action. My plan today is to discuss three points broadly and certainly address some of the issues and questions the court had during my opponent's argument. The knowledge element imposes rules that are aimed at preventing courts from holding premises owners strictly liable for injuries. That's the first point. And secondly, under those rules, Alonzo failed to provide sufficient evidence that churches knew or should have known that that substance was in that hallway on the floor at the time that Alonzo allegedly slipped and fell. And third, I'm not sure we didn't really discuss that in the first part, but I will get into the Corbin exception. I have time. This issue of the extent that Texas courts have recognized a rare exception where the knowledge element is disconnected from the specific substance on the floor, that this case doesn't qualify for that exception. Just to make sure, just talking about the knowledge element itself, in Texas law, that's kind of a gateway element to this cause of action. The Texas Supreme Court has said it's the core of the duty. After all, if we were to start holding premises owners liable without having any evidence that they knew or should have known that the substance was on the floor at that time, we would essentially be holding them strictly liable or treating them like an insurer toward their invitees. And so that's an approach the Texas Supreme Court and this court have repeatedly and consistently rejected. And so the courts adopted limiting principles that control this element. One of them, made chiefly among those, that the plaintiff has to prove that that element, that the knowledge that that element was there at that time, right? It's not just knowledge that there are sometimes elements in the building or there's sometimes elements that some parts of the floor may be wet at different times. It's got to be that element, that substance at that time. Along those lines, Texas law also requires more than proof of just a possibility that that substance was there when the slip and fall occurred. It's got to be more likely than not. So there's kind of a more than just possible rule that governs this. Additionally, in this case, the plaintiff relies solely on circumstantial evidence. And the circumstantial evidence, you know, just like a lot of cases, but here I think it's particularly important that the plaintiff is then subject to the reasonable inference rule, right? The circumstances proven have to give rise to a reasonable inference of this more likely than not knowledge of the specific substance on the ground. It can't just be an unreasonable inference or less than reasonable and it certainly can't be speculation or conjecture. So there are three paths generally recognized for knowledge in Texas law. One is if the defendant placed the substance on the ground. Obviously, if the defendant poured something on the ground or, you know, in this case, they claim mopping. That's one path that's really what I think the trial was mostly focused on. But there are other paths. You can have actual knowledge by some other means. Certainly, if there was some evidence, which doesn't exist in this case, that churches had seen the substance on the floor or somehow was informed by it, that's not really what we're talking about here. And then there's constructive knowledge, which is the substance was on the floor long enough that churches reasonably should have known that it was there. Here, the trial record is the plaintiff's case and the trial record really the only witness who testified who was in the building when the plaintiff slipped and fell was the plaintiff himself. And his testimony concerning what churches knew or should have known is very brief. It carries over in a couple of lines from page 17 to 718 of the record. And what he says, he does say that he slipped and fell, his hand hit the floor, and that it was wet with water and grease. And then he says that it seemed like they had maybe mopped or something. That it seemed like they had maybe mopped or something, which, you know, on its face just sounds like a guess. I mean, that is really just speculation. He said he does, and this court has recognized McCarty, and the sex court has recognized, too, that if it's just a possibility, even if that does raise the possibility of mopping, I mean, assuming that even can get there, that's nothing more than, that's not enough under this standard. And he didn't testify – and more than that, he didn't provide any kind of basis or foundation for the jury or the court to conclude why he guessed it had been mopped or something. He didn't say he'd seen an employee or mopping the floor. He didn't see a mopping bucket. He didn't describe the substance as being anything more than water and grease. So under Texas law, there are cases, you know, that we cite in the brief where courts have said that even seeing a mopping bucket isn't enough, but that's here just saying, well, maybe it's been mopped or something. I think that the district court rightly concluded that that is legally no evidence. That's nothing more than speculation, and if anything, it just raises a possibility. So the Plains' other evidence that they draw on is the testimony of a church's manager at that location who was not there in the building when the slip and fall occurred. So, of course, she couldn't testify as to what was on the floor in that hallway. She didn't know one way or the other. But she did testify about the church's general cleaning and inspection protocols, right? And I think overall, those protocols, at least to me, seem fairly normal and benign, but the protocols are that churches does inspect its floor every 30 minutes. If it needs to mop, it does mop the floor. She testified about how that floor in that hallway is made of some sort of special material that prevents slippage, too. And she testified that in her experience as a manager over the past, really, 10 years plus, that she had never heard of any kind of complaint from a customer of a slip and fall in that restaurant, aside from this one. So, I mean, it's kind of hard to infer. I don't see how the plaintiff gets to, you know, some sort of evidence that certainly mopping occurred from that. There's no evidence about what would the—other than that customers and employees do traverse that hallway, right, to get to the bathrooms, to get to the kitchen, to get to the main area. It is somewhat of a—it's a high-traffic kind of hallway that's very similar to what McCarty involved, which is an opinion from this court for 2017. We cite a lot in the brief, and so does the opposing counsel. There's not much there. I mean, I don't see how you get to mopping. And then as far as cracking about this issue of, you know, that there's some grease in the floor in the kitchen, again, that's still—we don't know where this substance came from. To the extent that raises it, the jury could infer that, well, that's a possibility that it was tracked there. It also could have been tracked by, you know, there's evidence that on average this facility has 200 to 300 customers a day, right, and sometimes even over 500 customers a day. Mr. Alonzo fell in the hallway between where the bathroom and the kitchen is. I mean, the bathroom itself could be—it's no one has. He's pointing the finger at the kitchen because that's where he thinks the church is—the whole church is liable. But there's no real difference between the two of them. So, you know, besides placement in the question as the judge says, I don't think there's really evidence of any other actual knowledge. So moving to constructive knowledge and longevity. The problem, as the district court pointed out in its opinion, is not, well, to the extent the 30-minute period, that's the maximum amount of time it could have been there. But we don't know when it got there because we don't know how it got there. I mean, it kind of just solidifies the point that we really don't—if we don't know how it got there, then we don't know when it arrived on the floor. So without longevity, I mean, yes, you know, there's—he testified. The plaintiff testifies that an unidentified church's employee walked past him and saw him fall. But there are plenty of cases, including McCarty, where defendants' employees witnessed a fall. That does not mean that they knew the substance was there to prevent the fall. I mean, that's the whole purpose of the knowledge element. But also, she's got—so the plaintiff would have to put on—make it more likely than not that the substance had been there for some period of time. I mean, maybe that proximity shortened is what that period of time would be. But we don't know where it came from or how it got there. So I think that, you know, otherwise I'll just briefly discuss—just make sure. Oh, I'll talk about the Aikens case. So she brought that since—my colleague brought that up on the other side. The Aikens case is very, very different on mopping than this case. It involves a plaintiff who walked out of a kitchen at a jail. She was an employee or a vendor for the jail. And she slipped and she walked through a room and into a hallway and immediately slipped and fell. And down that hallway, 10 to 15 feet away, was a mopping crew. And the mopping crew ran toward her and immediately started chewing out the mopping crew and blaming them for this. I mean, that alone is very different than this case. There were also other witnesses that blamed the mopping crew for what had happened. So that's a very different type of fact pattern than what we're talking about here and I think clearly distinct. On the issue of Ms. Gomez, the manager's slip in the kitchen. I mean, you know, the testimony is very vague on that front. I think it's not something that was really focused in the transcript. But it is—she clearly does say that. And she slipped in the kitchen but said, you know, there's no indication, you know, that this happened often or more than once. Certainly in the customer area, I think that's pretty different from this case. The Townsend case from this court, I think, is the one where the court had talked about, well, there was a mat, a floor mat in the entrance that had flipped up a couple of times in the last few years. And of course, that's not enough to put someone on notice that that mat is dangerous or was flipped up at that moment. It has to be flipped up at that moment. I'll say that's an unpublished case about Texas law, but I think that's an instructive way to think about this. The fact that there was a floor in the kitchen at some point in her 20-year career at churches does not really tell us anything about the knowledge element in this case. I also—so I'm going to speak a little bit about Corbin. I know we didn't get into that before. Corbin is a pretty—is an unusual case. And it wasn't something that was discussed by the district court in its opinion, I don't think, because it was really raised and discussed in the district court. It's—I'm not sure that the Fifth Circuit's ever applied—found a case that fits Corbin's fact pattern. I may be wrong about that. I haven't seen one in the briefing. I didn't find one. But I don't think so. So Corbin deals with the problem of normally—right? And the Supreme Court explains this in several opinions later, some as this court, including Brookshire v. Taylor and most recently this year in a case called Christ v. Department of Transportation. But a Safeway had a bin that was slanted and open and had a bunch of loose grapes inside of it, and it was over a green linoleum floor. So it's green grapes over a linoleum floor, and this is in violation of Safeway's policy. That's the testimony of the case. And their witnesses said they know that that's a dangerous—presents an unusually high risk because customers are grabbing grapes, dropping them on the green floor that nobody can see them very well. But the plaintiff in that case couldn't prove that that grape—that Safeway knew that grape that she slipped on was there. And so—but the court said, yeah, but Safeway knew how dangerous and unusually dangerous this display was. The Supreme Court has since emphasized repeatedly that the fact that it's a—that it is some sort of condition that presents some sort of risk does not meet the corporate standard. We normally require this specific knowledge requirement. So, I mean, the court is very concerned about elevating everyday hazards, ordinary risks to some sort of knowledge. And I think here that's important to keep in mind because what the plaintiff seems to be arguing is that churches knew, because it has a cleaning protocol of inspecting the floor every 30 minutes, that churches knows that their—that the floor gets dirty if it's not maintained. It's slippery if it's not maintained, and that slipperiness could come from the kitchen. It's possible that it could come from there. But that's—I mean, are we going to punish churches for that? I mean, I don't know what churches are supposed to do in response to that to, you know, address this notice problem. I mean, whether that's an unsafe practice or whatever, I mean, is churches better off? Is the incentive that it should be mopping all the time? Should it be inspect—does it need to inspect the store constantly? Does it need to inspect less so there's less notice and it doesn't give the court, the jury, the impression that it's aware that the floor gets dirty? This court has said, you know, in a case I think called Curry v. Chick-fil-A, another fried chicken restaurant, another unpublished opinion about Corbin where somebody slipped and fell in a restroom and said, well, I can't prove that churches knew that that restroom was slippery at the time, but churches certainly— Chick-fil-A. Chick-fil-A. Chick-fil-A. Thank you. Sorry. I need to distinguish it. I can't. My client might get after me for that. Chick-fil-A certainly knows that restrooms get slippery over time if we don't maintain them. Isn't that enough under Corbin? That's an unusually unsafe condition. And the court said, well, yes, public restrooms in restaurants present some degree of risk every day. That's true. Even home restrooms present some degree of risk every day. But the mere fact that Chick-fil-A knows that it will get more unsafe over time, that's not what Corbin's talking about. Corbin's talking about something that is always highly dangerous from the beginning of its inception, and we're not going to impose a notice standard that you're going to have to clear more than that. It's a difficult standard to meet for clients in many cases, and that's true. The court has recognized that's a harsh reality. That's the only way we can keep it from being a strict liability. If the court has no further questions, I don't really have anything else I plan to cover today. Thank you, counsel. Thank you, members. I'd like to hit a few points. First off, I want to make it very clear I in no way conceded that there is not legally sufficient evidence of actual knowledge. There isn't direct evidence of actual knowledge. But the Texas Supreme Court opinion in Cage v. Kroger makes clear that a jury may infer actual knowledge based on circumstantial evidence that the premises owner created the condition. And here there is circumstantial evidence that Church has created the condition, whether by mopping. Alonzo testified that when he stood up that it felt like they had mopped or something, or whether by tracking the grease in and out of the kitchen. And so under Cage v. Kroger, there is legally sufficient evidence to support the jury's verdict of actual knowledge. And if, Your Honor, if we move under that theory of actual knowledge, longevity isn't the issue. Longevity and the temporal basis ties into constructive knowledge theory of premises liability. I did want to direct, I did not have time to talk about Corbin. Opposing counsel raised Corbin and the Supreme Court's limitation of Corbin and CMH. I pulled a CMH decision and what CMH talks about is the issue then is what are the legal consequences if the premises will become unsafe over time and the owner or occupier is aware of that fact. And so it drew a limitation from Corbin when there is a condition that doesn't exist from the outset, but the dangerous condition arises over time because of deterioration, which is what happened in CMH. Here, however, there is evidence that the dangerous condition isn't something that arises from deterioration. That dangerous condition is from the outset. And when you look at the evidence that's in the record, you look and you see that recorded for 898, there is knowledge and testimony and admission that the floors get greasy from time to time by churches. There is the church's policy because they have this awareness of the dangerous condition and they're trying to prevent the dangerous condition by going around and inspecting the premises every 30 minutes and mopping. When employees mop, the floors are inherently wet. Then when the floor is wet, the floors are slippery. Again, that's record at 898 and record at 901. And then Gomez herself has slipped on the kitchen floor. And so when you look at the fact that this is not a deterioration issue like CMH, it is more of a dangerous condition that is frequent, that is constant. And that's why churches have adopted this policy to try to guard against it. Your Honor, that is the evidence in the record that supports the jury's verdict. And I need not remind that— In Texas cases, I recall, after Corbin, where HEB put up the mats that had the little round holes in them because they knew the grapes were a problem. And there's a case that talks about that. They know you've got to show something, the grape's dirty, it's smashed, or something beyond. It's just on the floor. Your Honor, I see that I'm out of time. I answer your concern. And then I'll wrap up. This isn't an issue where a grape fell and there were steps taken to prevent a grape from falling or to protect patrons from when a grape falls and is smashed and then a condition exists. This is an act by churches that creates the dangerous condition. It is churches' agrees to and from. It is the mopping and not putting a sign up. It is those actions and the active creation of the dangerous condition that creates the actual knowledge, whereas the dropping of the grape, Your Honor, is constructive knowledge.  Thank you, Your Honor. That will conclude the arguments before this panel for the week. The court is recessed and the cases are under submission. Thank you.